## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUSIANA

| | |
|---|---|
| DENNIS PALKON, Derivatively on Behalf of CENTURYLINK, INC. | **Civil Action No.:** |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| VIRGINIA BOULET, PETER C. BROWN, MARTHA H. BEJAR, KEVIN P. CHILTON, STEVEN T. CLONTZ, T. MICHAEL GLENN, W. BRUCE HANKS, MARY L. LANDRIEU, HARVEY P. PERRY, MICHAEL J. ROBERTS, LAURIE A. SIEGEL, GLENN F. POST III, SUNIT S. PATEL, JEFFREY K. STOREY, DAVID D. COLE, AND R. STEWART EWING JR | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| CENTURYLINK, INC | |
| Nominal Defendant. | |

1.    Plaintiff Dennis Palkon ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant CenturyLink Inc. ("CenturyLink" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties from at least March 1, 2013 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.    According to its public filings, CenturyLink is an international facilities-based communications company engaged primarily in providing an integrated array of services to their

business and residential customers.

3.      Prior to CenturyLink's merger with Level 3 Communications, Inc. ("Level 3"), which was completed on November 1, 2017, the Company's Consumer segment generated approximately one-third of CenturyLink's revenues. The Company's Consumer segment focused on residential customers, offering products and services including broadband, wireless, and video services (including Prism TV services), as well as legacy services such as local and long-distance telephone lines.

4.      The Company marketed its products and service primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing, and third parties. The Company's business strategy relied on "bundling" its products – *i.e.* providing customers with a comprehensive set of products and services purportedly to "enhance customer loyalty." CenturyLink emphasized "customer-oriented sales, marketing, and service" in its sales approach to residential customers.

5.      CenturyLink reported an operating revenue of over $17 billion for the year ended on December 31, 2017. During 2017, 98% of this revenue was derived from providing telecommunications, colocation, and hosting services within the United States.

6.      On June 14, 2017 a company insider, Ms. Heiser ("Heiser") filed a complaint alleging that CenturyLink wrongfully terminated her because of the whistleblower actions she had initiated (the "Heiser Complaint"). The Heiser Complaint notes the actions of CenturyLink that prompted the whistleblower actions of Heiser. Heiser learned from her work that the system and practices used by CenturyLink with its sales agents allowed persons who had a personal incentive to add services or lines to customer accounts to falsely indicate on the CenturyLink system the approval by a customer of new lines or services, which would then inure to the direct

or indirect benefit of such CenturyLink agents or their superiors. Many of these additional lines or services resulted in *additional charges not authorized by the customer.*

7.      On June 16, 2017, the truth concerning the misconduct in the Company's business practices was revealed in a Bloomberg article entitled, "CenturyLink Is Accused of Running Wells Fargo-Like Scheme."

8.      On this news, CenturyLink's stock price fell $1.23 per share, to close at $25.72 per share on June 16, 2017, a decline of nearly *5%*.

9.      On June 19, 2017, after Bloomberg reported that a consumer complaint, based on the Heiser Complaint, had also been filed against CenturyLink, alleging fraud, unfair competition, and unjust enrichment, CenturyLink's share price declined another $0.36 per share to close at $25.36 per share.

10.     On July 12, 2017, the Attorney General of Minnesota, Lori Swanson ("Swanson"), filed a complaint alleging that CenturyLink was committing consumer fraud through deceptive trade practices in connection with the sale of its internet and television services (the "Minnesota Complaint"). Specifically, the Minnesota Complaint alleges that CenturyLink falsely promised consumers that its services will cost a particular price when in fact the company charges consumers another price.

11.     During the Relevant Period, the Individual Defendants made and caused the Company to disseminate false and misleading statements to the investing public concerning the Company's business model, prospects, and business practices, and its financial and internal controls. Specifically, they caused the Company to make false and/or misleading statements and/or failed to disclose that: (1) CenturyLink's aggressive marketing strategy relied on false information to lure and retain customers; (2) the Company's policies allowed its employees to

add services or lines to accounts without customer permission, resulting in millions of dollars in unauthorized charges to CenturyLink customers; (3) accordingly, the Company's revenues were the product of illicit conduct and were thus unsustainable; (4) the foregoing illicit conduct was likely to subject CenturyLink to heightened regulatory scrutiny; (5) CenturyLink had inadequate corporate financial reporting, and failed to maintain effective internal controls over financial reporting; and (6) as a result of the foregoing, CenturyLink's public statements were materially false and misleading at all relevant times.

12.     Accordingly, as a result of defendants' reckless breaches of fiduciary duty and other misconduct, the Company has been substantially damaged.

13.     In light of these events described herein, and in accordance with Louisiana law, on August 2, 2017, Plaintiff send a written litigation demand (the "Demand") to Virginia Boulet ("Boulet"), CenturyLink's current Chairman of the Board, demanding that CenturyLink's Board investigate and take legal action against those responsible for the damages the Company has suffered and is certain to suffer. A true and correct copy of the Demand is attached hereto as Exhibit A.

14.     On August 11, 2017, Plaintiff received correspondence from the Company's counsel, Stacey W. Goff ("Goff") acknowledging receipt of the Demand (the "August 11 Letter"). The August 11 Letter also stated that the Company would consider actions to be taken at the next regularly scheduled board meeting.

15.     On September 19, 2017, Plaintiff received a letter from Steven W. Usdin ("Usdin") stating that the Board appointed a Special Litigation Committee (the "SLC") to investigate the allegations and demands in the Demand (the "September 19 Letter"). In addition, the September 19 Letter requested, "that you defer instituting any legal proceedings until the

completion of that inquiry, which is being conducted as expeditiously as possible." A true and correct copy of the September 19 Letter is attached hereto as Exhibit B.

16.    On March 2, 2018, Plaintiff received further correspondence from Usdin, updating the status of the SLC (the "March 2 Letter"). The March 2 Letter stated that the committee expected to be in a position to provide its conclusion within 60 days.

17.    On April 13, 2018, Plaintiff received correspondence from Usdin, regarding the outcome of the investigation conducted concerning the Demand (the "Refusal"). Therein, Usdin informed Plaintiff of the following:

> The SLC has carefully considered the demands made by you and by other shareholders. The SLC found no evidence to support the allegations made in the demand letters. The SLC also considered the institutional changes and advancements at CenturyLink as well as the pending litigation and other regulatory matters CenturyLink now faces. In light of all of the information and relevant considerations, and the legal standards set forth in La. R.S. 12:1-830 *et seq.* and La. R.S. 12:1-840 *et seq.*, as well as other relevant statutes, the SLC has determined that it is not in the best interest of CenturyLink to pursue litigation against any Directors, Officers, or employees of the company, or to act on any of the demands made on the company. Accordingly, pursuant to La. R.S. 12:1-740 *et seq.,* the SLC is rejecting your demand.

A true and correct copy of the Refusal is attached hereto as Exhibit C.

18.    On May 4, 2018, Plaintiff wrote to Usdin in response to the Refusal (the "May 4 Letter"). The May 4 Letter requested additional information regarding the SLC's investigation. Specifically, the May 4 Letter, requested additional information regarding; (1) the 31 witnesses interviewed by the SLC and any other witnesses the SLC attempted to interview, (2) the "institutional changes and advancements at CenturyLink" referenced in the Refusal, (3) the "pending litigation and other regulatory matters CenturyLink now faces" referenced in the Refusal, and (4) the stockholder demands issued to CenturyLink other than the Demand. A true and correct copy of the May 4 Letter is attached hereto as Exhibit D.

19.     On May 11, 2018, Plaintiff received further correspondence from Usdin (the "May 11 Letter"). The May 11 Letter stated that "[i] If you would like to review the relevant minutes and Board resolutions, we will prepare a confidentiality agreement for your client to sign." A true and correct copy of the May 11 Letter is attached hereto as Exhibit E.

20.     That offer was subsequently rescinded when, after attempts by Plaintiff to discuss the specifics of the proposed confidentiality agreement provided by Usdin, Plaintiff received a letter at June 29, 2018 which stated that because other shareholder derivative lawsuits had already been filed in behalf of CenturyLink, the Company "we will not be providing any of the requested information." A true and correct copy of the June 29, 2018 letter is attached hereto as Exhibit F.

21.     In light of the foregoing, the Board's refusal is improper, demonstrating the Board's lack of good faith, and confirming that Plaintiff should be allowed to proceed and to prosecute this action derivatively on behalf of the Company.

## JURISDICTION AND VENUE

22.     The Court has jurisdiction over all claims pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states, and the matter in controversy exceeds $75,000, exclusive of interests or costs. The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     The Court has jurisdiction over each Defendant because each Defendant is either a corporation that does sufficient business in Louisiana or is an individual who has sufficient minimum contacts with Louisiana so as to render the exercise of jurisdiction by the Louisiana

courts permissible under traditional notions of fair play and substantial justice.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District, and the Company conducts business in and maintains executive offices in this District.

## THE PARTIES

25.    Plaintiff is a current shareholder of CenturyLink common stock and has continuously held CenturyLink common stock since 2008.  Plaintiff is a citizen of Pennsylvania.

26.    Nominal defendant CenturyLink is a Louisiana corporation that provides an array of services to residential and business customers. CenturyLink is headquartered in Louisiana and its registered agent/office is located in Monroe, Louisiana. CenturyLink's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CTL."

27.    Defendant Virginia Boulet ("Boulet") has served as a director for CenturyLink since 1995. Defendant Boulet is a member of the Nominating and Corporate Governance Committee. During the Relevant Period, Defendant Boulet, while in possession of material, non-public information, Boulet sold at least 6,207 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $211,634.  Upon information and belief Defendant Boulet is a citizen of Louisiana.

28.     Defendant Peter C. Brown has served as a director on CenturyLink's Board since 2009. Defendant Brown is a member of the Boards Audit Committee and Pricing Committee, as well as Chair of the Risk Evaluation Committee. During the Relevant Period, Defendant Brown, while in possession of material, non-public information, sold at least 12,724 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $389,991.  Upon information and belief Defendant Brown is a citizen of Missouri.

29.     Defendant Martha H. Bejar ("Bejar") has served on CenturyLink's Board of Directors since January 2016. Defendant Bejar is a member of the Boards Audit Committee and the Risk Evaluation Committee.  Upon information and belief Defendant Bejar is a citizen of Washington.

30.     Defendant Kevin P. Chilton ("Chilton") has been a director of CenturyLink since November 2017. Prior to CenturyLink's merger with Level 3 in November 2017, Chilton was a director at Level 3. During the Relevant Period, Defendant Chilton was a member of the Company's Audit Committee and the Risk Evaluation Committee. Upon information and belief Defendant Chilton is a citizen of Colorado.

31.     Defendant Steven T. Clontz ("Clontz") has been a director of CenturyLink since November 2017. Prior to CenturyLink's merger with Level 3 in November 2017, Clontz was a director at Level 3. During the Relevant Period, Defendant Clontz was a member of the Company's Nominating and Corporate Governance Committee.  Upon information and belief Defendant Clontz is a citizen of Florida.

32.     Defendant T. Michael Glenn ("Glenn") has been a director of CenturyLink since November 2017. Prior to CenturyLink's merger with Level 3 in November 2017, Glenn was a director at Level 3. During the Relevant Period, Defendant Glenn was a member of the Company's Human Resources and Compensation Committee.  Upon information and belief Defendant Glenn is a citizen of Tennessee.

33.     Defendant W. Bruce Hanks ("Hanks") has served as a director on CenturyLink's Board since 1992. Defendant Hanks is the chairman of the Boards Audit Committee, the Risk Evaluation Committee, and Pricing Committee. In addition, Defendant Hanks has served as the Vice Chairman of the Board since May 2017. Upon information and belief Defendant Hanks is a

citizen of Louisiana.

34.     Defendant Mary L. Landrieu ("Landrieu") has served as a director on CenturyLink's Board since November 2015. Defendant Landrieu was a member of the Company's Nominating and Corporate Governance Committee and the Risk Evaluation Committee during the Relevant Period.  Upon information and belief Defendant Landrieu is a citizen of Louisiana.

35.     Defendant Harvey P. Perry ("Perry") has served as a director on CenturyLink's Board since 1990. Defendant Perry has served as the non-executive Vice Chairman of the Board of Directors for CenturyLink since 2004 and is a member of the Company's Risk Evaluation Committee. Defendant Perry retired from CenturyLink in 2003 after joining the Company in 1984, when he served as Secretary and General Counsel for nearly 20 years, as well as Executive Vice President and Chief Administrative Officer for almost five years. During the Relevant Period, Defendant Perry, while in possession of material, non-public information, sold at least 30,000 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $945,000.  Upon information and belief Defendant Perry is a citizen of Louisiana.

36.     Defendant Michael J. Roberts ("Roberts") has served as a director for CenturyLink since 2011. Defendant Roberts was a member of the Company's Nominating and Corporate Governance Committee and the Human Resources and Compensation Committee. Upon information and belief Defendant Roberts is a citizen of California.

37.     Defendant Laurie A. Siegel ("Siegel") has served as a director for CenturyLink since 2009. During the Relevant Period, Defendant Siegel was the Chair if the Company's Human Resources and Compensation Committee. During the Relevant Period, Defendant Siegel, while in possession of material, non-public information, sold at least 4,983 personally held

shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $134,286. Upon information and belief Defendant Siegel is a citizen of New Jersey.

38.     Defendant Glen F. Post III ("Post") has served as a director on CenturyLink's Board since 1990. Defendant Post also served as Chief Executive Officer ("CEO") of CenturyLink since 1992. Defendant Post also served as President of CenturyLink since 2009 as well as from 1990 to 2002. From 2002 to 2009, Defendant Post served as Chairman of the Board of Directors of CenturyLink as well as Vice Chairman of the Board from 1993 to 2002. During his time at CenturyLink, Defendant Post also served as Chief Financial Officer ("CFO") and Chief Operating Officer ("COO").  Upon information and belief Defendant Post is a citizen of Louisiana.

39.     Defendant Sunit S. Patel ("Patel") has been the Company's CFO and Executive Vice President since November 2017.  Upon information and belief Defendant Patel is a citizen of Colorado.

40.     Defendant Jeffrey K. Storey ("Storey") served as the Company's President and COO and has been a director of CenturyLink since November 2017. On May 23, 2018 Defendant Storey became the Company's CEO. Upon information and belief Defendant Storey is a citizen of Oklahoma.

41.     Defendant David D. Cole ("Cole") has served as CenturyLink's Executive Vice President – Controller and Operations Support since May 2013. In addition, Defendant Cole served as Senior Vice President – Controller and Operations Support from April 2011 to May 2013 and as Senior Vice President – Operations Support from 1999 to April 2011. During the Relevant Period, Defendant Cole, while in possession of material, non-public information, sold at least 37,525 personally held shares of CenturyLink stock at artificially inflated prices for

proceeds of approximately $1,298,938. Upon information and belief Defendant Cole is a citizen of Louisiana.

42.    Defendant R. Stewart Ewing Jr. ("Ewing") served as CenturyLink's Executive Vice President and CFO since 1999. In addition, Defendant Ewing has served as Assistant Secretary since 2009, and served as Senior Vice President and CFO from 1989 to 1999. During his time at CenturyLink, Defendant Ewing also held the position of Controller and Vice President of Finance. During the Relevant Period, Defendant Ewing, while in possession of material, non-public information, sold at least 65,600 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $2,601,070. Upon information and belief Defendant Ewing is a citizen of Louisiana.

43.    Collectively, defendants Boulet, Brown, Bejar, Hanks, Landrieu, Perry, Roberts, Siegel, Post, Cole, and Ewing shall be referred to herein as the "Individual Defendants."

44.    Collectively, defendants Brown, Bejar, Chilton, and Hanks are sometimes referred to herein as the "Audit Committee Defendants."

45.    Collectively, Defendants Boulet, Brown, Cole, Perry, Siegel, and Ewing are sometimes referred to herein as the "Insider Selling Defendants."

**DEFENDANTS' DUTIES**

46.    By reason of their positions as officers, directors, and/or fiduciaries of CenturyLink and because of their ability to control the business and corporate affairs of CenturyLink, the Defendants owed CenturyLink and its shareholders fiduciary obligations of good faith, loyalty, due care, and candor, and were and are required to use their utmost ability to control and manage CenturyLink in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of CenturyLink and its shareholders so

as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to CenturyLink and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

47. Each director and officer of the Company owes to CenturyLink and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

48. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Audit Committee Duties**

49. In addition to these duties, the members of the Audit Committee owed specific duties to CenturyLink under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

50. Specifically, according to CenturyLink's Audit Committee Charter, the Audit Committee's responsibilities include the primary function of assisting the Board in fulfilling its oversight duties by:

- overseeing the Company's system of financial reporting, auditing, controls, and legal compliance;

- monitoring the operation of such system and the integrity of the Company's financial statements and related disclosures;

- monitoring the qualifications, independence and performance of the outside and internal auditors, and;

- overseeing the Company's finance functions.

51.    Specifically, regarding review of financial reporting, the members of the Audit

Committee owed specific duties to the Company under the Audit Committee Charter to:

- review and discuss with management and the outside auditors the Company's quarterly financial statements and MD&A disclosures prior to their public release;

- discuss with management the Company's financial information and earnings guidance provided to analysts and rating agencies;

- review with management and the outside auditors the Company's financial information, including (a) any report, opinion or review rendered on the financial statements by management or the outside auditors (including under SAS No. 61 or 71) and (b) any analysis prepared by management or the outside auditors setting forth significant financial reporting issues and judgements made in connection with the preparation of the financial statements;

- review and discuss reports from the outside auditors on:

  o The Company's critical accounting policies;

  o All alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative treatments, and the treatment preferred by the outside auditors; and

  o Other material written communications between the outside auditors and management, such as any management letter or schedule or unadjusted differences;

- review and discuss reports from the outside auditors on:

  o conditions or matters, if any, that must be reported under generally accepted auditing standards (including SAS No. 61), including; (1) difficulties or disputes with management or the internal auditors encountered during the audit and (2) the outside auditors' views regarding the Company's financial disclosures, the quality of the Company's accounting principles as applied, the underlying estimates and other significant judgments made by management in preparing the financial statements, and the compatibility of the Company's principles and judgements with prevailing practices and standards;

- 13 -

- o matters, if any, that must be reported under federal securities laws (including Section 10A of the Exchange Act); and

- o communications, if any, with the national office of the outside auditors pertaining to the Company's financial affairs;

- review with management, the internal auditors and the outside auditors:

  - o the Company's annual assessment of its internal controls and the related written reports required under 404 of the Sarbanes-Oxley Act;

  - o the adequacy of the Company's internal controls; and

  - o reports, no less than quarterly, regarding internal controls assessment processes under 404 of the Sarbanes-Oxley Act, including reports on any "material weakness" or "significant deficiency" and the Company's remediation steps;

- review with management and the outside auditors major issues regarding accounting principles and financial statement presentations, if any, including (a) significant changes in the Company's selection or application of accounting principles, (b) major issues as to the adequacy of the Company's financial reporting and (c) special audit steps adopted in light of material deficiencies;

- discuss with management and the outside auditors office the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements;

- discuss the Company's major financial risk exposures and the steps management has take to monitor and control such exposures;

- review the accounting implications of significant and new transactions, if any.

52.     Further, regarding internal controls and compliance oversight, the members of the

Audit Committee owed specific duties to the Company under the Audit Committee Charter to:

- monitor the effectiveness of the Company's procedures for receiving, retaining, and handling confidential, anonymous complaints regarding accounting, controls or auditing matters (maintained under SEC Rule 10A-3);

- discuss any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies;

- review the adequacy of the Company's disclosure controls and procedures;

- review reports on "related party" transactions;

- solicit, as necessary, generate reports or information from the Risk Evaluation Committee or other board committees with related oversights functions;

- review annually the procedures established by the Company to monitor its compliance with debt covenants; and

- consult periodically with counsel concerning the Audit Committee's responsibilities or legal matters that may have a material impact on the Company's financial statements, controls, or corporate compliance procedures.

53.    Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Duties Pursuant to the Company's Code of Conduct**

54.    Additionally, the Individual Defendants, as officers and/or directors of CenturyLink, are bound by the Company's Code of Conduct (the "Code") which, according to the Code, "sets forth the basic principles we must follow to uphold our Company's ethical business culture." Each employee, officer, and director of CenturyLink is covered by the Code.

55.    According to the Code, each employee, officer, and director of CenturyLink is required to:

- Accurately record all assets, liabilities, revenues, and expenses;

- Follow all internal control procedures;

- Never make false or artificial journal entries; and

- 'never establish unsupported reserves or accruals.

56.    Further, the Code also provides specific additional responsibilities to "senior financial officers – including, but not limited to, our Chief Executive Officer, Chief Financial

Officer, and Chief Accounting Officer." These officers "must ensure that the financial information we disclose in public communications and file in the Company periodic reports with the [SEC] is full, fair, accurate, timely, and understandable." In addition, senior financial officers are required to:

- Help maintain reliable internal controls, assess their quality and effectiveness, implement improvements, and report or resolve weaknesses that could materially affect or render financial disclosures or reports inaccurate;

- Inform the Disclosure Committee of transactions, events, or circumstances that could have a material impact on our Company's financial reports;

- Fairly and accurately represent material facts or circumstances when interacting with our auditors and those individuals who prepare our Company's financial statements; and

- Ensure that those who perform accounting or financial functions know and adhere to these principles.

57. Upon information and belief, the Company maintained a version of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Board as those set forth above.

**Control, Access, and Authority**

58. The Individual Defendants, because of their positions of control and authority as directors and/or officers of CenturyLink, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by CenturyLink.

59. Because of their advisory, executive, managerial, and directorial positions with CenturyLink, each of the Individual Defendants had access to adverse, non-public information about financial condition, operations, and improper representations of CenturyLink.

60. At all times relevant hereto, each of the Individual Defendants was the agent of

each of the other Individual Defendants and of CenturyLink and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

61.    To discharge their duties, the officers and directors of CenturyLink were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of CenturyLink were required to, among other things:

a)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)   properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the company's business and financial prospects and internal controls;

d)   remain informed as to how CenturyLink conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

e) ensure that CenturyLink was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

62.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to CenturyLink and its shareholders the fiduciary duty of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of CenturyLink, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CenturyLink, the absence of good faith on their part, and a reckless disregard for their duties to CenturyLink and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to CenturyLink.

63.     The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

64.     In addition, as a result of the Individual Defendants' illicit actions and course of conduct, the Company is now the subject to multiple lawsuits that allege violations of federal securities laws, consumer fraud, and a breach of fiduciary duties. As a result, CenturyLink has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## SUBSTANTIVE ALLEGATIONS

A.    **Company Background**

65.     CenturyLink was incorporated in Louisiana in 1968 with principal executive

offices in Monroe, Louisiana.

66.     CenturyLink's is an integrated communications company that purportedly provides an array of services including local and long-distance voice, virtual private network ("VPN") data network, private line (including business data services), Ethernet, information technology, wavelength, broadband, colocation and data center services, managed services, professional and other services provided in connection with selling equipment, network security and various other ancillary services.

67.     With approximately 450,000 route miles of fiber optic cable globally, CenturyLink is among the largest providers of communications services to global enterprise customers. CenturyLink operates in over 60 countries, with a substantial majority of its revenue being derived in the United States.

68.     As of December 31, 2017, CenturyLink serves approximately 5.7 million broadband subscribers, through their 10.3 million total access lines. CenturyLink operates nearly 75% of their total access lines in portions of Colorado, Arizona, Washington, Minnesota, Florida, North Carolina, Oregon, Iowa, Utah, New Mexico, Missouri, and Idaho, and also provide local services in portions of 25 other states. In the portion of the 37 states where CenturyLink has local access lines, they are the incumbent local telephone company.

69.     However, CenturyLink's rapid expansion through acquisitions had created a complicated internal structure since the Company's computer systems were not fully integrated, leading to multiple sales and billing platforms that were difficult for the Company's employees to access with accuracy.

70.     Without sufficient precautions in place, the Company's sales employees were encouraged to aggressively promote bundled services to customers, often without accurate

pricing information, leading to a consistent pattern of promising lower prices than what the customers were actually charged.

71.     When the customers then called to complain about overbilling or charges for unauthorized additional services, the Company's employees would routinely refuse to honor the original price quotes and would deny any errors. If the customer cancelled the services anyway, additional termination fees or other penalties would then be charged.

**B.      A Company Insider Blows the Whistle on the Company's Sales Practices**

72.     On June 14, 2017, a former employee of CenturyLink, Heidi Heiser, filed a complaint in Maricopa County, Arizona alleging she was terminated for whistleblowing activities. According to the Heiser Complaint, Ms. Heiser was hired by CenturyLink in August 2015 as a home-based customer service and sales agent.  Under the terms of her employment with CenturyLink, Ms. Heiser was provided with phones and other equipment and was forwarded customer calls through CenturyLink provided phone lines.  As part of her employment with the Company, Ms. Heiser would have calls with customers in order to help CenturyLink customers resolve issues with service and billing.  Ms. Heiser also had a sales component to her employment.  The Heiser Complaint alleges that Ms. Heiser was one of hundreds of employees with similar job descriptions and responsibilities.  Ms. Heiser further alleges in the Heiser Complaint that CenturyLink maintained performance expectations and incentive programs for sales agents like Ms. Heiser (and other employees of the Company who had sales responsibilities) wherein CenturyLink employees would be rewarded, in part, based on the number of lines or services sold to customers, the upselling of services to existing customers, and the growth of the service base at CenturyLink.

73.     According to the Heiser Complaint, CenturyLink's system and practices used by

CenturyLink with its sales and other agents allowed persons who had a personal incentive to add services or lines to customer accounts to falsely indicate on the CenturyLink system the approval by a customer of new lines or services, which would then inure to the direct or indirect benefit of such CenturyLink agents or their superiors.  The Heiser Complaint further alleges, upon information and belief, that at times the internal indications of additional lines or services to a customer's account may not have been apparent to the customer.  On certain occasions, the additional lines or services resulted in additional charges not authorized by the customer and in some situations lead to customers being assigned, designated for, and billed for services **they did not know about or could not access**.

74.    About the same time Ms. Heiser became aware of this misconduct, Ms. Heiser learned of the pending legal actions against Wells Fargo & Company ("Wells Fargo"), which had led to millions of dollars in fines, the termination of thousands of employees, and harmed Wells Fargo's reputation as a result of Wells Fargo's alleged conduct in opening fake accounts and signing unsuspecting customers up for services they never requested.  The similarities between the conduct at Wells Fargo and CenturyLink was not lost on Ms. Heiser, who was intimately familiar with the pressure CenturyLink used on its own sales force to reach unattainable sales targets.

75.    As a result, Ms. Heiser brought these concerns to CenturyLink personnel within her chain of command.  Rather than acting to investigate these concerns, CenturyLink responded by terminating Ms. Heiser.  Ms. Heiser then filed the Heiser Complaint.

76.    Adding credence to Ms. Heiser's claims, former CenturyLink customers have also taken to the courts.  Separate class-action suits have been filed against CenturyLink in seven states (Arizona, California, Colorado, Idaho, Nevada, Oregon and Washington).  In those

complaints, consumers allege they were not only charged higher than quoted prices, but also billed for phone lines and services never requested.

C.    **The Minnesota Attorney General Alleges Fraudulent Conduct**

77.    Specific allegations of the misconduct endured by former CenturyLink customers are detailed in the complaint filed by the Attorney General of Minnesota against CenturyLink on July 12, 2017 which alleges the Company has used deceptive sales practices to commit fraud (the "Minnesota Complaint").   The Minnesota Complaint alleges that CenturyLink has wrongfully charged Minnesota consumers and ignored Minnesota consumer protection laws specifically designed to protect consumers against this type of behavior.   Minnesota also alleged that CenturyLink's "CRIS" billing system for customers is designed to purposefully obfuscate the purchasing process and lull consumers into a false sense of security about the cost and terms of their bill.

78.    The Minnesota Complaint contains dozens of allegations where Minnesotans were charged well above promised rates and the Company's intentional refusal to honor quoted prices. For example:

- Customer "R.T." is a 62-year-old businessman from Blaine, Minnesota. In CenturyLink's Online Chat feature, a CenturyLink salesperson named Gianna C. offered him what he considered to be a great deal, internet service for $29.95 per month for two years, with television service for $39.97 for one year and $59.97 the year after for a total cost of $89.92 per month.  In the Online Chat, R.T. even sought to confirm that these prices were inclusive of equipment and fees, and was told by CenturyLink agent Gianna C. that "it includes everything."  Despite this, CenturyLink charged R.T. $194.84 for his first month of service and $107.68 for the months afterwards. When R.T. called to complain, CenturyLink asserted that they were above the law, an unregulated entity able to raise or lower prices at their own discretion.

- Customer "J.S." accepted CenturyLink's offer of internet and television service for $91.83 per month for one year.  CenturyLink repeatedly failed to honor its promise and charged her $202.04, $103.43, $116.97, $108.15, and $128.26, respectively, the first five months she had this package. CenturyLink told her its billing system is "complicated" and "hard to explain" and that sales agents can offer promotions that

the system then "removes."

- Customer "K.N." is 60 years old. CenturyLink promised him internet service for a base rate of $29.95 per month but failed to bill him as promised, charging him a base rate of $61 instead. CenturyLink told him, "you're doing math, and you're trying to break [the cost] down in a way that it's not supposed to be broken down . . . there's no 'this is how much it costs.'" K.N. asked how much the company would charge him the next month, and CenturyLink said, "honestly, you're not going to know . . . until the next bill prints." CenturyLink later wrote to him stating he was "ineligible" for the offer CenturyLink promised him and that he had accepted months earlier.

79.    According to the Minnesota Complaint, in internal communications, CenturyLink employees themselves admit to these misleading businesses practices, stating that perhaps one in every five customers is quoted an accurate price and that customers who call in to complain are passed around and ignored by CenturyLink employees. In each case, the response of CenturyLink Management has been to deny, delay, or dissemble. Management repeatedly caused CenturyLink to refuse to honor its own offers, whether they were made in person or in print.

80.    The Minnesota Complaint further details a scheme wherein CenturyLink has misrepresented the nature of an Internet Cost Recovery Fee to consumers who notice it on their multi-page bills, sometimes falsely calling it: a federal fee; a fee for their internet line; a phone tax; an undisputable charge; a FCC-regulated fee; a form of insurance; a fee that is negotiated with each state; or a fee for the consumer's phone line. Internal CenturyLink communications from April of 2016 produced to the State of Minnesota acknowledges that the Company has "misinformed" consumers by calling the Internet Cost Recovery Fee "a tax," a false description repeated on recordings produced to the State of Minnesota. The Internet Cost Recovery Fee is not any of these things. In truth, it is simply part of the base monthly rate that CenturyLink charges all Minnesota consumers (and likely those throughout the country) with internet service, but that the company has artificially listed separately on its bills as a "fee" to make its base rates

- 23 -

appear lower to price sensitive customers.

81.    Upon information and belief, CenturyLink's improper activities which gave rise to the Minnesota Complaint are not unique to Minnesota, but CenturyLink is liable to customers in other states for conduct similar to that alleged in the Minnesota Complaint.

**D.    The Individual Defendants False and Misleading Statements**

82.    On March 1, 2013, the Individual Defendants caused CenturyLink to file a Form 10-K with the SEC, announcing the Company's financial and operating results for the fourth quarter and year ended December 31, 2012 (the "2012 10-K"). For the year, the Company reported earnings per share of $1.25 on operating revenues of $18.4 billion, compared to operating revenue of $15.4 billion in the previous year. With respect to the Company's sales practices, the 2012 10-K stated, in relevant part:

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel to promote sales of services that meet the needs of our customers. ***Our strategy is to enhance our communications services by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.***

\*    \*    \*

***Our approach to our regional markets' residential customers emphasizes customer-oriented sales, marketing and service with a local presence.*** We market our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Our approach to our regional markets' business and government customers includes a commitment to deliver communications products and services that meet existing and future business needs through bundles of services and integrated service offerings. Our focus is to be a comprehensive communications

solution for our small office, mid-sized and select enterprise business and government customers.

83.    Further, with respect to regulations and compliance, the 2012 10-K stated, in

relevant part:

**Regulation**

We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications in our local service area. These agencies issue rules to protect consumers and promote competition; they set the rates that telecommunication companies charge each other for exchanging traffic; and they have established USF to support the provision of services to high-cost areas. In most states, local voice service, switched and special access services and interconnection services are subject to price regulation, although the extent of regulation varies by type of service and geographic region. In addition, we are required to maintain licenses with the FCC and with the utility commissions of most of the states in our local service area. Laws and regulations in many states restrict the manner in which a licensed entity can interact with affiliates, transfer assets, issue debt and engage in other business activities, and many mergers and acquisitions require approval by the FCC and some state commissions.

*      *      *

**Federal Regulation**

We are required to comply with the Communications Act of 1934, which requires us to offer services at just and reasonable rates and on non-discriminatory terms, as well as the Telecommunications Act of 1996, which amended the Communications Act of 1934 primarily to promote competition.

84.    In addition, with respect to the Company's ethics standards, the 2012 10-K stated,

in relevant part:

We have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees, including our principal executive officer and senior financial officers, in accordance with applicable laws and rules promulgated by the SEC and the New York Stock Exchange. In the event that we make any changes (other than by a technical, administrative or non-substantive amendment) to, or provide any waivers from, the provisions of our code of conduct applicable to our directors or executive officers, we intend to

- 25 -

disclose these events on our website or in a report on Form 8-K filed with the SEC. These codes of conduct, as well as copies of our guidelines on significant governance issues and the charters of our audit committee, compensation committee, nominating and corporate governance committee and risk evaluation committee, are also available in the "Corporate Governance" section of our website at www.centurylink.com/Pages/AboutUs/Governance/ or in print to any shareholder who requests them by sending a written request to our Corporate Secretary at CenturyLink, Inc., 100 CenturyLink Drive, Monroe, Louisiana, 71203.

85. The 2012 10-K contained signed certifications pursuant to the Sabanes-Oxley Act of 2002 ("SOX") by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed material changes to the Company's internal control over financial reporting. The 2012 10-K was also signed by Defendants Post, Ewing, Cole, Boulet, Brown, Hanks, Perry, Roberts, and Siegel.

86. On February 27, 2014, the Individual Defendants caused CenturyLink to file a Form 10-K with the SEC, announcing the Company's financial and operating results for the fourth quarter and year ended December 31, 2013 (the "2013 10-K"). For the year, the Company reported operating revenues of $18.1 billion, compared to operating revenue of $18.4 billion in the previous year, as well as a net loss of $239 million, compared to net income of $777 million in the previous year. With respect to the Company's sales practices, the 2013 10-K stated, in relevant part:

*Products and Services*

Our products and services include local and long-distance, broadband, private line (including special access, which we market to wholesale and business customers), MLPS, data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, public access, wireless, video services and other ancillary services.

We offer our customers the ability to bundle together several products and services. For example, we offer integrated and unlimited local and long-distance services. Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon

Wireless (through our strategic partnership) services. We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.

\*       \*       \*

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel to promote sales of services that meet the needs of our customers. Our strategy is to enhance our communications services by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.

\*       \*       \*

Our approach to our business and governmental customers includes a commitment to deliver communications and network products and services that meet existing and future business needs through bundles of services and integrated service offerings. Our focus is to be a comprehensive communications solution for our small office, mid-sized and select enterprise business and governmental customers. We market our products and services primarily through direct sales representatives, inbound call centers, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, telemarketing and third parties.

Our approach to our wholesale customers includes a commitment to deliver communications solutions that meet existing and future needs of national network telecommunications providers through bandwidth growth and quality of services.

Our data hosting operations utilize a solution-based selling approach. By working directly with potential and existing clients, we are able to understand our clients' IT infrastructure and long-term goals. We also market through indirect channels, including collaborations with existing clients and technology providers, telecommunications companies and system integrators.

87.    With respect to regulations and compliance, and to ethics standards, the 2013 10-K included similar statements to those contained in the 2012 10-K as stated above.

88.    The 2013 10-K contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and

disclosed material changes to the Company's internal control over financial reporting. The 2013 10-K was also signed by Defendants Post, Ewing, Cole, Boulet, Brown, Hanks, Perry, Roberts, and Siegel.

89.    On May 7, 2014, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended March 31, 2014 ("Q1 2014"). For the quarter, CenturyLink reported net income of $203 million, or $0.35 per diluted share, on revenue of $4.54 billion, compared to net income of $298 million, or $0.48 per diluted share, on revenue of $4.51 billion for the same period in the prior year. Commenting on these results, Defendant Post stated, "Cash flows for the quarter were also strong primarily due to our revenue outperformance and disciplined cost containment by our employees. We continue to see increasing demand from business customers for our reliable, secure solutions that meet their network and hosting need."

90.    On May 9, 2014, the Individual Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC ("Q1 2014 10-Q"), confirming the results in the press release. The Q1 2014 10-Q stated, in relevant part:

> We are an integrated communications company engaged primarily in providing an array of communications services to our residential, business, governmental, and wholesale customers. Our communications services include local and long-distance, broadband, private line (including special access), Multiprotocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, public access, video, and other ancillary services.

> *    *    *

> ***We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communication services.***

91.    The Q1 2014 10-Q contained signed SOX certifications by Defendants Post and

Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

92.    On August 6, 2014, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended June 30, 2014 ("Q2 2014"). For the quarter, CenturyLink reported net income of $193 million, or $0.34 per diluted share, on revenue of $4.54 billion, compared to net income of $269 million, or $0.44 per diluted share, on revenue of $4.53 billion for the same period in the prior year. Commenting on these results, Defendant Post stated:

> Cash Flows for the quarter were also strong, primarily due to solid revenue performance and continued focus by our employees on containing costs.
>
> *        *        *
>
> We had a strong funnel of sales opportunities entering the third quarter and we are looking forward to continuing to execute on our strategic priorities to create value for shareholders.

93.    On August 7, 2014, the Individual Defendants caused CenturyLink to file a quarterly report on Form 10-Q (the "Q2 2014 10-Q"), confirming the results in the press release. The Q2 2014 10-Q contained signed SOX certifications by "Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

94.    On November 5, 2014, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended September 30, 2014 ("Q3 2014"). For the quarter, CenturyLink reported net income of $188 million, or $0.33 per diluted share, on revenue of $4.51 billion, compared to net loss of $1.05 billion, or $1.76 per diluted share, on revenue of $4.42 billion for the same period in the prior year. Commenting on these results, Defendant Post stated:

We expect the expansion of our symmetrical 1 gigabit service to 16 cities that we announced in August to create additional opportunities to drive strategic revenue growth from businesses and consumers in the months ahead. Also, we have recently integrated and aligned our sales and service delivery models to improve the consistency and effectiveness of our to-to-market strategies as we remain focused on driving increased sales and operating effectiveness in our business.

95.    On November 6, 2014, the Individual Defendants caused CenturyLink to file a quarterly report on Form 10-Q with the SEC (the "Q2 2014 10-Q"), confirming the results in the press release. The Q3 2014 10-Q contained signed SOX certifications by Defendant Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

96.    On February 24, 2015, the Individual Defendants caused CenturyLink to file a Form 10-K with the SEC, announcing the Company's financial and operating results for the fourth quarter and year ended December 31, 2014 (the "2014 10-K"). For the year, the Company reported operating revenues of $18.0 billion, compared to the operating revenue of $18.1 billion in the previous year, as well as net income of $772 million, compared with the net loss of $239 million in the previous year. With respect to the Company's sales practices, the 2014 10-K stated, in relevant part:

*Products and Services*

Our products and services include local and long-distance, broadband, private line (including special access), MPLS, data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, video, wireless and other ancillary services.

*We offer our customers the ability to bundle together several products and services*. For example, we offer integrated and unlimited local and long-distance services. Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. *We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.*

*      *      *

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel to promote sales of services that meet the needs of our customers. ***Our strategy is to enhance our sales by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.***

97.    With respect to regulations and compliance, and to ethics standards, the 2014 10-K included similar statements to those contained in the 2012 10-K as stated above.

98.    The 2014 10-K contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed and material changes to the Company's internal control over financial reporting. The 2014 10-K was also signed by Defendants Post, Ewing, Cole, Boulet, Brown, Hanks, Perry, Roberts, and Siegel.

99.    On May 5, 2015, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended March 31, 2015 ("Q1 2015"). For the quarter, CenturyLink reported net income of $192 million, or $0.34 per diluted share, on revenue of $4.45 billion, compared to net income of $203 million, or $0.35 per diluted share, on revenue of $4.54 billion for the same period in the prior year. Commenting on these results, Defendant Post stated:

> We are beginning to see the benefits of the organizational realignment implemented in late 2014, and we are confident our new streamlined operating structure positions us to drive stronger sales results, strategic revenue growth and operating efficiency. We continue to see strong demand from business customers for high-bandwidth data services and our integrated network and IT managed service solutions.

100.    On May 6, 2015, the Individual Defendants caused CenturyLink to file a quarterly

- 31 -

report on Form 10-Q with the SEC (the "Q1 2015 10-Q"), confirming the results in the press

release. The Q1 2015 10-Q contained signed SOX certifications by Defendants Post and Ewing,

certifying that the financial information contained on the filing was accurate and disclosed any

material changes to the Company's internal control over financial reporting.

101.    On August 5, 2015, the Individual Defendants caused CenturyLink to issue a

press release and file a current report on Form 8-K with the SEC reporting its financial results for

the quarter ended June 30, 2015 ("Q2 2015"). For the quarter, CenturyLink reported net income

of $143 million, or $0.26 per diluted share, on revenue of $4.42 billion, compared to net income

of $193 million, or $0.34 per diluted share, on revenue of $4.54 billion for the same period in the

prior year. Commenting on these results, Defendant Post stated:

> The sales force realignment that we completed earlier this year is gaining traction
> and beginning to positively impact our results. For example, the improvement in
> sales to business customers that began in March continued throughout the quarter,
> resulting in 15% sequential growth in Business sales compared to first quarter
> sales. In addition, we exited the second quarter with a strong funnel of sales
> opportunities, which has continued to grow. While our path to revenue ad cash
> flow growth is taking longer than we initially anticipated, we remain confident
> that we have the right assets and strategies to drive long-term growth.

102.    On August 6, 2015, the Individual Defendants caused CenturyLink to file a

quarterly report in Form 10-Q with the SEC (the "Q2 2015 10-Q"), confirming the results in the

press release. The Q2 2015 10-Q contained signed SOX certifications by Defendants Post and

Ewing, certifying that the financial information contained in the filing was accurate and

disclosed any material changes to the Company's internal controls over financial reporting.

103.    On November 4, 2015, the Individual Defendants caused CenturyLink to issue a

press release and file a current report on Form 8-K with the SEC reporting financial results for

the quarter ended September 30, 2015 ("Q3 2015"). For the quarter, CenturyLink reported net

income of $205 million, or $0.37 per diluted share, on revenue of $4.55 billion, compared to net

income of $188 million, or $0.33 per diluted share, on revenue of $4.51 billion for the same period in the prior year. Commenting on these results, Defendant Post stated:

> We exited the quarter with a very strong business sales funnel, including an increased number of large deal oppurtunities. This funnel has continued to strengthen during fourth quarter and October sales results were the highest of the year.

104.   On November 5, 2015, the Individual Defendants caused CenturyLink to file a quarterly report on Form 10-Q with the SEC (the "Q3 2015 10-Q"), confirming the results in the press release. The Q3 2015 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

105.   On February 25, 2016, The Individual Defendants caused CenturyLink to file a Form 10-K with the SEC, announcing the Company's financial and operating results for the fourth quarter and year ended December 31, 2015 (the "2015 10-K"). For the year, the Company reported operating revenues of $17.9 billion, compared to operating revenue of $18.0 billion in the previous year, as well as net income of $878 million, compared with net income of $772 million in the previous year. With Respect to the Company's sales practices, the 2015 10-K stated, in relevant part:

> ***Products and Services***
> Our products and services include local and long-distance voice, high-speed Internet, MPLS, private line (including special access), data integration, Ethernet, colocation, managed hosting (including cloud hosting), network, public access, video, wireless and other ancillary services.
>
> We offer our customers the ability to bundle together several products and services. For example, we offer integrated and unlimited local and long-distance voice services. Our customers can also bundle two or more services such as high-speed Internet, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.

- 33 -

\*      \*      \*

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel and a variety of channel partners to promote sales of services that meet the needs of our customers. Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands. Our offerings include both stand-alone services and bundled services designed to meet the needs of different customer segments.

\*      \*      \*

Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. Our marketing plans include marketing our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms. We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

106.    With resect to regulations and compliance, and to ethics standards, the 2015 10-K included similar statements to those contained in the 2012 10-K as stated above.

107.    The 2015 10-K contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal controls over financial reporting. The 2015 10-K was also signed by Defendants Post, Ewing, Cole, Bejar, Boulet, Brown, Hanks, Landrieu, Perry, Roberts, and Siegel.

108.    On May 4, 2016, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended March 31, 2016 ("Q1 2016"). For the quarter, CenturyLink reported net income of

$236 million, or $0.44 per diluted share, on revenue of $4.4 billion, compared to net income of $192 million, or $0.34 per diluted share, on revenue of $4.45 billion for the same period in the prior year. Commenting on these results, Defendant Post stated:

> CenturyLink achieved another solid quarter, with core revenues, operating cash flow and adjusted diluted earnings per share in-line with our previous guidance.

> \*        \*        \*

> We remain on track with our data centers and colocation business strategic alternatives process and are pleased with the level of interest and progress to date. We continue to focus on leveraging our strategic asset portfolio and financial strength to execute on our operational initiatives and better serve our customers.

109.    On May 5, 2016, the Individual Defendants caused CenturyLink to file a quarterly report on Form 10-Q with the SEC (the "Q1 2016 10-Q"), confirming the results in the press release. The Q1 2016 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

110.    On August 3, 2016, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC, reporting its financial results for the quarter ended June 30, 2016 ("Q2 2016"). For the quarter, CenturyLink reported net income of $196 million, or $0.36 per diluted share, on revenue of $4.4 billion, compared to net income of $143 million, or $0.26 per diluted share, on revenue of $4.42 billion for the same period in the prior year. Commenting on these results, Defendant Post stated:

> ***Our new sales and marketing leadership team continues to refine our sales channels and associated go-to-market strategies for the Business market, and continues to pivot toward higher-value bundled solutions for the Customer market.*** While second quarter Consumer subscriber metrics were softer than anticipated, we expect to see an improvement in unit trends in the second half o the year.

111.    On August 4, 2016, the Individual Defendants caused CenturyLink to file a

- 35 -

quarterly report on Form 10-Q with the SEC, confirming the results in the press release (the "Q2 2016 10-Q"). The Q2 2016 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing is accurate and disclosed any material changes to the Company's internal controls over financial reporting.

112.    On October 31, 2016, CenturyLink entered into and agreement and plan of merger to acquire Level 3, in a cash and stock transaction valued at approximately $34 billion including the assumption of debt. The combined company positions CenturyLink as the second largest domestic communications provider, serving global enterprise customers in more than 60 countries.

113.    Also on October 31, 2016, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended September 30, 2016 ("Q3 2016"). For the quarter, CenturyLink reported net income of $152 million, or $0.28 per diluted share, on revenue of $4.38 billion, compared to net income of $205 million, or $0.37 per diluted share, on revenue of $4.55 billion for the same period in the prior year.

114.    On November 4, 2016, the Individual Defendants caused CenturyLink to file a quarterly report on Form 10-Q with the SEC (the "Q3 2016 10-Q"), confirming the results in the press release. The Q3 2016 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

115.    On February 23, 2017, the Individual Defendants caused CenturyLink to file a Form 10-K with the SEC, announcing the financial results for the fourth quarter and year ended on December 31, 2016 (the "2016 10-K"). For the year, CenturyLink reported operating

revenues of $17.5 billion, compared to operating revenue of $17.9 billion in the previous year, as well as net income if $626 million, compared to $878 million in the previous year. With respect to the Company's sales practices, the 2016 10-K stated, in relevant part:

### *Products and Services*

From time to time, we change the categorization of our products and services, and we may make similar changes in the future. During the second quarter of 2016, we determined that because of declines due to customer migration to other strategic products and services, certain of our business low-bandwidth data services, specifically our private line (including special access) services in our business segment, are more closely aligned with our legacy services than with our strategic services. As described in greater detail in Note 14—Segment Information, these operating revenues are now reflected as legacy services.

Our products and services include local and long-distance voice, broadband, MPLS, private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, VoIP, information technology and other ancillary services.

We offer our customers the ability to bundle together several products and services. For example, we offer integrated and unlimited local and long-distance voice services. Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.

*      *      *

### Sales and Marketing

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel and a variety of channel partners to promote sales of services that meet the needs of our customers. Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands. Our offerings include both stand-alone services and bundled services designed to meet the needs of different customer segments.

*      *      *

Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. Our

marketing plans include marketing our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms. We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

116.    With respect to regulations and compliance, and to ethics standards, the 2016 10-K included similar statements to those contained in the 2012 10-K as stated above.

117.    The 2016 10-K contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

118.    On May 3, 2017, the Individual Defendants caused CenturyLink to issue a press release and file a current report on Form 8-K with the SEC reporting its financial results for the quarter ended March 31, 2017 ("Q1 2017"). For the quarter, CenturyLink reported net income of $163 million, or $0.30 per diluted share, on revenue of $4.21 billion, compared to net income of $236 million, or $0.44 per diluted share, on revenue of $4.4 billion in the same period in the prior year. Commenting on these results, Defendant Post stated:

CenturyLink's first quarter high-bandwidth data services revenues for Enterprise customers grew by 2% sequentially and 4% year-over-year, driven by increasing demand for higher-speed Enterprise data services as businesses continue their digital transformation… This increasing demand further validates the rationale for our pending acquisition of Level 3 Communications, which will transform CenturyLink into the second largest domestic communications provider serving global enterprise customers.

We continue to make good progress in obtaining the necessary approvals for the pending Level 3 acquisition and integration planning for the combination is on track. We are very pleased with the extremely talented and experienced senior leadership team for the combined company, announced last week, which will be effective at closing. We continue to expect to complete the transaction by the end of September 2017.

119.    On May 5, 2017, the Individual Defendants caused CenturyLink to file a quarterly

report on Form 10-Q with the SEC (the "Q1 2017 10-Q"), confirming the results in the press

release. The Q1 2017 10-Q contained signed SOX certifications by Defendants Post and Ewing,

certifying that the financial information contained in the filing was accurate and disclosed any

material changes to the Company's internal controls over financial reporting.

120.    On June 1, 2017, the Individual Defendants caused CenturyLink to issue a press

release and file a current report on Form 8-K with the SEC announcing the Company's CEO

succession plan. The press release stated, in relevant part:

> **MONROE, La. –** CenturyLink, Inc. (NYSE: CTL) today announced that upon
> closing of the CenturyLink – Level 3 acquisition, Jeff Storey, currently president
> and CEO of Level 3 Communications, Inc. (NYSE: LVLT), will join CenturyLink
> as its president and chief operating officer. As previously announced, after the
> closing Glen F. Post III will remain CEO of CenturyLink. It is expected that
> Storey will succeed Post as CEO of CenturyLink effective Jan. 1, 2019 and that
> Post will then become executive chairman of the company's board of directors.
>
> The two companies continue to expect to close the transaction by Sept. 30, 2017.
>
> "Throughout our company's evolution, we have focused on investment, growth
> and value creation. I am pleased that our collective work has put us at the
> forefront of the digital world. As we move into this next phase of our growth, I
> am confident in the strength of our position, the scope of our opportunity and
> Jeff's ability to lead our company forward – first as president and COO and then
> as CEO," Post said. "Transitions like this are bittersweet, but I am confident this
> is the right time to begin to take this next step into our future. At CenturyLink, I
> have had the privilege of working with some of the most talented people in our
> industry. Their leadership, dedication, loyalty and tireless efforts have been – and
> will continue to be – the key to our success. I look forward to joining forces with
> Jeff and the talented employees from Level 3 as we pursue the exciting
> opportunities that lie ahead."
>
> "Jeff has been an excellent leader for Level 3 and shares our excitement about the
> future of our business and the importance of world-class customer experience to
> our success," Post said. "Just as important, Jeff shares my focus on continuing to
> invest in our network, products and services to meet our customers' needs. I look
> forward to continuing to work closely with Jeff to shape the future of the
> combined company."
>
> "Glen has done an exceptional job leading CenturyLink over the last 25 years,
> steadily transforming the company to become a leading international

communications provider," Storey said. "I strongly believe in the combination of the two companies and I am very excited to become part of the CenturyLink management team after the transaction closes. I look forward to continuing to work with Glen to drive a successful integration, an outstanding customer experience and growth in shareholder value. The opportunities ahead of us are exciting and I am committed to building on this impressive foundation."

CenturyLink also announced that Harvey P. Perry, vice chairman of the board of CenturyLink, has been appointed chairman of the board, effective immediately. He replaces William A. Owens, who retired from the board on May 24, 2017. W. Bruce Hanks, a member of the CenturyLink board of directors, has been named vice chairman, also effective immediately. As previously announced, Storey is one of four Level 3 board members who will join the CenturyLink board at closing.

## E.    The Truth Begins to Emerge

121.    On June 16, 2017, *Bloomberg* reported on the filing of the Heiser Complaint, detailing the claims that Ms. Heiser was fired for blowing the whistle on the Company's high-pressure sales culture that allegedly left customers paying millions of dollars for accounts they didn't request.

122.    On this news, CenturyLink's stock price fell $1.23 per share, or nearly **5%,** to close at $25.72 per share on Jun 16, 2017.

123.    On June 19, 2017, *Bloomberg* reported that another complaint has been filed against CenturyLink: "a class action seeking damages as high as $12 billion." According to the article:

The new lawsuit, filed in the central district of California late Sunday night, cites Heiser's lawsuit, as well as similar accusations posted on social media and consumer review websites by people identifying themselves as CenturyLink customers, and accuses CenturyLink of fraud, unfair competition, and unjust enrichment.

"Ms. Heiser's allegations of what she observed, and what CenturyLink corporate culture encouraged, are consistent with the experiences of hundreds of thousands and potentially millions of consumers who have been defrauded by CenturyLink," the complaint states. "It is estimated that the damages to consumers could range between $600 million and $12 billion, based on CenturyLink's 5.9 million

subscribers."

124.    Following these additional revelations, CenturyLink's stock declined another $0.36 per share to close at $25.36.

125.    Less than a month later, news of the Minnesota Complaint hit the press detailing the Company's misconduct.  In response, Post sent an email to Company employees.  After first acknowledging that "[w]e take these allegations very seriously and are diligently investigating them" and pledging to "be fair and do the right thing," Post then went on the offensive, alleging that the claims in the Heiser Complaint and the Minnesota Complaint "were accompanied by what seems to be a pretty coordinated negative media and PR campaign aimed at CenturyLink."

126.    Details continued to emerge of the Company's pattern of improper sales practices, resulting in numerous additional lawsuits. Class action suits against CenturyLink on behalf of the Company's customers were filed in numerous states including Alabama, Arizona, California, Colorado, Idaho, Nevada, Oregon, and Washington.

127.    On October 23, 2017, CenturyLink entered into a stipulated order with the Minnesota Attorney General. Among other things, the Company agreed to:

a)  Not make any false statement of material fact or omit any material fact in connection with the sale of internet and/or television services to Minnesota consumers; and

b)  Provide, at the time of sale:

   i.    The monthly base price of the services purchased;
  ii.    The amount of each monthly recurring fee in addition to the monthly base price;
 iii.    The amount of monthly access recovery charges;
  iv.    All one-time fees charged to the initial bill;
   v.    The amount of the first invoice;
  vi.    Recurring total costs;
 vii.    Total duration of the agreement; and
viii.    Any restrictions or conditions on a consumer's ability to receive the quoted price.

- 41 -

128.    On November 1, 2017, CenturyLink completed its acquisition of Level 3. In connection with the acquisition, CenturyLink issued a press release and filed a current report on Form 8-K with the SEC stating, in relevant part:

Management Transitions. In accordance with our previously-announced succession plan, Glen F. Post, III stepped down from the role of President of CenturyLink effective upon completion of the Initial Merger (such time, the "Closing"). Mr. Post continues to serve as our Chief Executive Officer and a director.

Jeffrey K. Storey, age 57, was appointed to serve as President and Chief Operating Officer of CenturyLink (and, as noted below, one of our directors) effective upon the Closing. As previously announced, we currently anticipate that Mr. Storey would succeed Mr. Post as our Chief Executive Officer on January 1, 2019, at which time Mr. Post would become executive chairman of our board of directors.

Appointment of New Directors. Effective upon the Closing, we expanded the size of our Board of Directors from 9 to 13 members. At such time, pursuant to the Merger Agreement, our Board appointed the individuals set forth below (each of whom served as a director of Level 3 prior to the Closing) to the Board and to the respective committees thereof specified below:

| Name | Committee (s) |
| --- | --- |
| Kevin P. Chilton | Audit; Risk Evaluation |
| Steven T. Clontz | Nominating and Governance |
| T. Michael Glenn | Human Resources and Compensation |
| Jeffrey K. Storey | — |

Each of Messrs. Chilton, Clontz, and Glenn will participate in CenturyLink's outside director compensation program described in our 2017 proxy statement, which was filed with the Commission on April 10, 2017. In accordance with that program, each will receive a pro-rated grant of restricted stock valued at $81,500 on the date of grant to recognize his service from the Closing through the projected date of our 2018 annual meeting. These shares of restricted stock will vest on May 25, 2018, with earlier vesting in the event of certain terminations of service or the occurrence of a change of control and subject to all other terms and conditions of the applicable equity incentive plan and award agreement. In addition, each new director is expected to execute and receive the benefit of CenturyLink's form of indemnification agreement for directors, a copy of which

has been filed as Exhibit 10.1 to our Current Report on Form 8-K filed with the Commission on February 29, 2016.

<u>Retirement of Certain Officers of CenturyLink</u>. Effective at the Closing, R. Stewart Ewing, Jr., who previously served as our Executive Vice President and Chief Financial Officer, and Dean J. Douglas, who previously served as President – Enterprise Markets, each stepped down from all executive positions with CenturyLink and its subsidiaries. Mr. Ewing's retirement will be effective after a short transition period, and Mr. Douglas' retirement was effective immediately.

In connection with Mr. Ewing's retirement, our Human Resources and Compensation Committee approved a discretionary increase in the amount of cash severance due to him under our Executive Severance Plan, from 52 weeks of pay to 104 weeks of pay, resulting in an additional $1,399,158 due to him. In addition, the Committee awarded Mr. Ewing a special discretionary cash bonus of $1,000,000 based on its assessment of his performance related to merger integration activities over the past year. The Committee also approved certain changes to his outstanding equity awards. Specifically, the Committee accelerated vesting of all 46,157 of Mr. Ewing's outstanding shares of time-based restricted stock effective at Closing. With respect to his 97,304 outstanding shares of performance-based restricted stock, Mr. Ewing will continue to hold those awards subject to their original performance conditions. In connection with approving this supplemental compensation, the Committee considered a range of factors, including Mr. Ewing's contributions to the growth of CenturyLink over the past 34 years and the critical role he played in connection with negotiating, financing and implementing the Acquisition.

129.    On December 7, 2017, CenturyLink issued a press release and filed a current report on Form 8-K with the SEC announcing the conclusions and key findings of the special committee of independent board members. The press release stated, in relevant part:

**MONROE, La. – Dec. 7, 2017** – <u>CenturyLink, Inc.</u> (the "Company") today announced that a Special Committee of independent board members has reported the findings of its previously announced review of the Company's policies, procedures and practices relating to consumer sales, service and billing. The Company's outside directors promptly and voluntarily formed the Special Committee after a former employee alleged that the Company engaged in sales-related misconduct, including charging customers for services they did not order—a practice known as "cramming." Over the past six months, the Special Committee, together with independent counsel from O'Melveny & Myers LLP and forensic data analysts, collected and searched more than 9.7 million documents as well as 4.3 terabytes of billing data consisting of over 32 billion

billing records; they also interviewed more than 200 current and former Company employees.

The Company's management cooperated fully with the Special Committee during this review.

The Special Committee's key findings:

- The investigation did not reveal evidence to conclude that any member of the Company's management team engaged in fraud or wrongdoing.

- Company management did not condone or encourage cramming, and the evidence did not show that cramming was common at the Company. The Company maintains specific policies and procedures that prohibit and are designed to prevent and deter cramming. When instances of cramming were found to have occurred, the Company took reasonable actions to discipline employees. However, the Company's investment in consumer sales monitoring was not sufficiently effective in proactively detecting and quantifying potential cramming.

- Some of the Company's products, pricing and promotions were complex and caused confusion, and the resulting bills sometimes failed to meet customer expectations. Additionally, limitations in the Company's ordering and billing software made it difficult to provide customers with estimates of their bills and confirmation of service letters that reflected all discounts, prorated charges, taxes and fees.

- Systems and human errors led to certain customers not receiving an offered point-of-sale discount. The Company did not fully address this issue in a timely manner for some customers.

In commenting on the Special Committee's investigation, CenturyLink CEO Glen Post stated, "The Company accepts the Special Committee's findings and conclusions. The investigation confirmed my long-held belief that there was no fraud or wrongdoing at the Company and that cramming was neither widespread nor condoned. However, we know there have been times when we haven't provided our customers the experience they deserve. We have identified a number of areas where we can improve the customer experience and have already made significant progress in addressing those areas."

Mr. Post concluded, "We remain committed to maintaining an ethical business culture based on our Unifying Principles—fairness, honesty and integrity, commitment to excellence, positive attitude, respect, faith and perseverance. Those principles are at the core of who we are as a company and we want our customers to feel that in every interaction with us."

130.    On March 6, 2018, CenturyLink issued a press release announcing that the Company's CEO, Defendant Post, would be retiring in May, effective the date of the Company's annual meeting, and that Defendant Storey would assume the role as CEO on that date. Previously, Defendant Post had stated that he would remain as CEO until January 1, 2019. In connection with Post's retirement, he stands to receive, upon retirement: (1) vesting of half of his 2018 time-vested restricted shares; (2) retention of half of his 2018 performance-based restricted shares subject to their original performance conditions; (3) vesting of the equity portion of his 2017 special integration award at a 100% payout rate; and (4) full vesting of all time-vested restricted shares granted to him before 2018 and to retain, subject to their original performance conditions, all performance-based restricted shares gained to him before 2018.

131.    As a result of these actions, the company and its shareholders have suffered significant damages.

## F.    <u>Insider Selling</u>

132.    During the Relevant Period, while in possession of material, adverse, non-public information, certain of the Individual Defendants took advantage of the artificially inflated prices to sell their CenturyLink shares for substantial proceeds. Specifically, as detailed herein, the Insider Selling Defendants collectively sold more than *$5.6 million* of personally held CenturyLink common stock.

133.    Defendant Ewing was the Company's CFO during the Relevant Period. Ewing was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Ewing sold at least 65,600 personally held shares of CenturyLink stock at

artificially inflated prices for proceeds of *more than $2.6 million.* Ewing's sales were timed to maximize profits from the Company's then arterially inflated stock prices.

134.    Defendant Cole was the Company's CAO and Controller during the Relevant Period. Cole was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Cole sold at least 37,525 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of *more than $1.29 million.* Cole's sales were timed to maximize profits from the Company's then artificially inflated stock price.

135.    Defendant Boulet was a member of the Company's Board during the Relevant Period. Boulet was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Boulet sold at least 6,207 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately *$211,634.* Boulet's sales were timed to maximize profits from the Company's then artificially inflated stock price.

136.    Defendant Brown was a member of the Company's Board during the Relevant Period. Brown was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Brown sold at least 12,724 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately *$389,991.* Brown's sales were timed to maximize profits from the Company's then artificially inflated stock price.

137.    Defendant Perry was the Chairman of the Board during the Relevant Period. Perry was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Perry sold at least 30,000 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately *$945,000.* Perry's sales were timed to maximize profits from the Company's then artificially inflated stock price.

138.    Defendant Siegel was a member of the Company's Board during the Relevant Period. Siegel was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Siegel sold at least 4,983 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately *$134,285.* Siegel's sales were timed to maximize profits from the Company's then artificially inflated stock price.

139.    These insider sales were executed under highly suspicious circumstances and occurred while the Company's stock price was artificially inflated due to the misrepresentations and omissions alleged herein. The Insider Selling Defendants' sales during the Relevant Period include the following:

| Defendant | Position | Date | Shares Sold | Stock Price | Proceeds |
|---|---|---|---|---|---|
| EWING | CFO | 11/12/2014 | 40,000 | $41.05 | $201,917.50 |
| | | 11/13/2014 | 5,000 | $40.38 | $1,642,132.00 |
| | | 5/12/2014 | 600 | $36.79 | $22,074.06 |
| | | 5/12/2014 | 20,000 | $36.75 | $734,946.00 |
| **Total** | | | **65,600** | | **$2,601,069.56** |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| COLE | CAO | 12/2/2014 | 7,525 | $41.05 | $308,938.12 |
| | | 10/27/2016 | 30,000 | $33.00 | $990,000.00 |
| **Total** | | | **37,525** | | **$1,298,938.12** |
| | | | | | |
| BOULET | Director | 5/28/2013 | 3,007 | $37.07 | $111,469.49 |
| | | 3/6/2014 | 3,200 | $31.30 | $100,164.48 |
| **Total** | | | **6,207** | | **$211,633.97** |
| | | | | | |
| BROWN | Director | 2/29/2016 | 12,724 | $30.65 | $389,990.60 |
| **Total** | | | **12,724** | | **$389,990.60** |
| | | | | | |
| PERRY | Chairman | 7/13/2016 | 20,000 | $31.00 | $620,000.00 |
| | | 10/27/2016 | 5,000 | $32.00 | $160,000.00 |
| | | 10/27/2016 | 5,000 | $33.00 | $165,000.00 |
| **Total** | | | **30,000** | | **$945,000.00** |
| | | | | | |
| SIEGEL | Director | 12/9/2015 | 4,380 | $26.95 | $118,041.00 |
| | | 12/9/2015 | 603 | $26.94 | $16,244.82 |
| **Total** | | | **4,983** | | **$134,285.82** |

## DERIVATIVE AND DEMAND ALLEGATIONS

140.   Plaintiff brings this action derivatively in the right and for the benefit of CenturyLink to redress the breaches of fiduciary duty and other violations of law by Defendants.

141.   Plaintiff is, and at all relevant times has been, a CenturyLink shareholder. Plaintiff will adequately and fairly represent the interests of CenturyLink and its shareholders in enforcing and prosecuting its rights.

142.   In light of these events described herein, and in accordance with Louisiana law, on August 2, 2017, Plaintiff send a written litigation demand (the "Demand") to Virginia Boulet ("Boulet"), CenturyLink's current Chairman of the Board, demanding that CenturyLink's Board

investigate and take legal action against those responsible for the damages the Company has

suffered and is certain to suffer. A true and correct copy of the Demand is attached hereto as

Exhibit A.

143.    On August 11, 2017, Plaintiff received correspondence from the Company's

counsel, Stacey W. Goff ("Goff") acknowledging receipt of the Demand (the "August 11

Letter"). The August 11 Letter also stated that the Company would consider actions to be taken

at the next regularly scheduled board meeting.

144.    On September 19, 2017, Plaintiff received a letter from Steven W. Usdin

("Usdin") stating that the Board appointed a Special Litigation Committee (the "SLC") to

investigate the allegations and demands in the Demand (the "September 19 Letter"). In addition,

the September 19 Letter requested, "that you defer instituting any legal proceedings until the

completion of that inquiry, which is being conducted as expeditiously as possible." A true and

correct copy of the September 19 Letter is attached hereto as Exhibit B.

145.    On March 2, 2018, Plaintiff received further correspondence from Usdin,

updating the status of the SLC (the "March 2 Letter"). The March 2 Letter stated that the

committee expected to be in a position to provide its conclusion within 60 days.

146.    On April 13, 2018, Plaintiff received correspondence from Usdin, regarding the

outcome of the investigation conducted concerning the Demand (the "Refusal"). Therein, Usdin

informed Plaintiff of the following:

> The SLC has carefully considered the demands made by you and by other
> shareholders. The SLC found no evidence to support the allegations made in the
> demand letters. The SLC also considered the institutional changes and
> advancements at CenturyLink as well as the pending litigation and other
> regulatory matters CenturyLink now faces. In light of all of the information and
> relevant considerations, and the legal standards set forth in La. R.S. 12:1-830 *et
> seq.* and La. R.S. 12:1-840 *et seq.*, as well as other relevant statutes, the SLC has
> determined that it is not in the best interest of CenturyLink to pursue litigation

against any Directors, Officers, or employees of the company, or to act on any of the demands made on the company. Accordingly, pursuant to La. R.S. 12:1-740 *et seq.,* the SLC is rejecting your demand.

A true and correct copy of the Refusal is attached hereto as Exhibit C.

147.    On May 4, 2018, Plaintiff wrote to Usdin in response to the Refusal (the "May 4 Letter"). The May 4 Letter requested additional information regarding the SLC's investigation. Specifically, the May 4 Letter, requested additional information regarding; (1) the 31 witnesses interviewed by the SLC and any other witnesses the SLC attempted to interview, (2) the "institutional changes and advancements at CenturyLink" referenced in the Refusal, (3) the "pending litigation and other regulatory matters CenturyLink now faces" referenced in the Refusal, and (4) the stockholder demands issued to CenturyLink other than the Demand. A true and correct copy of the May 4 Letter is attached hereto as Exhibit D.

148.    On May 11, 2018, Plaintiff received further correspondence from Usdin (the "May 11 Letter"). The May 11 Letter stated:

> The Special Litigation Committee has considered your request for the information identified in your letter. Subject to a confidentiality agreement, we will provide minutes and Board resolutions relevant to the SLC's investigation in accordance with La. R.S. 12:1-1602(A) and 12:1-1601(E), which entitles shareholders to inspect those documents. The information you requested, however, falls outside the scope of La. R.S. 12:1-1601(E), and it is neither necessary nor appropriate for us to share any additional information with you. If you would like to review the relevant minutes and Board resolutions, we will prepare a confidentiality agreement for your client to sign.

A true and correct copy of the May 11 Letter is attached hereto as Exhibit E.

149.    That offer was subsequently rescinded when, after attempts by Plaintiff to discuss the specific of the proposed confidentiality agreement provided by Usdin, Plaintiff received a letter at June 29, 2018 which stated that because other shareholder derivative lawsuits had already been filed in behalf of CenturyLink, the Company "we will not be providing any of the

requested information." A true and correct copy of the June 29, 2018 letter is attached hereto as Exhibit F.

150.    In light of the foregoing, the Board's refusal is improper, demonstrating the Board's lack of good faith, and confirming that Plaintiff should be allowed to proceed and to prosecute this action derivatively on behalf of the Company.

151.    CenturyLink is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

## COUNT I

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCAIARY DUTY

152.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as it fully set forth herein.

153.    As alleged in detail herein, each of the Defendants had a duty to ensure that CenturyLink disseminated accurate, truthful and complete information to its shareholders.

154.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to CenturyLink's shareholders materially misleading and inaccurate information through, *inter alia,* SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgement.

155.    As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's pricing practices were maintained in good faith, and, when put on notice of problems with the Company's business practices and operations by customers, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

156.     Defendants willfully ignored the obvious and pervasive problems with CenturyLink's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

157.     Defendants misconduct alleged herein constituted an abuse of their ability to control and influence CenturyLink, for which they are legally responsible. In particular, Defendants abused their positions of authority by causing or allowing CenturyLink to misrepresent material facts regarding its financial conduct and business prospects.

158.     Defendants had a duty to CenturyLink and its shareholders to prudently supervise, manage, and control the operations, business and internal financial accounting, and disclosure of CenturyLink.

159.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of CenturyLink in a manner consistent with the duties imposed upon them by the law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence, and candor in the management and administration of CenturyLink's affairs and in the use and preservation of CenturyLink's assets.

160.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing CenturyLink to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.      Awarding to CenturyLink restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  August 1, 2018

MEADE YOUNG LLC

By:      */s/ John Alden Meade*
John Alden Meade (La. Bar 29975)
909 Poydras St., Suite 1600
New Orleans, LA 70112
T: 504-799-3102
F: 504-717-2846
E: jam@meadeyoung.com

**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
BRETT D. STECKER
JAMES M. FICARO
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062
rw@weiserlawfirm.com
bds@weiserlawfirm.com
jmf@weiserlawfirm.com

*Counsel for Plaintiff*